February 27.
JUDGE CARR.
The facts of this case seem to be, that B. Talbert, when he purchased the woman Jenny, made her a promise that when she should have a child for every one of his, (he then having five) he would set her free. This promise, though no way binding, the old people, (and especially Mrs. Tal-bert,) seem to have been anxious to comply with. In 1792, B, Talbert made a Deed to his youngest son, Charles, then, and always after, living with him, conveying to him Jenny and her son Moses. This Deed was confessedly voluntary, made, as some of the witnesses say, to cover the property from an apprehended claim, afterwards compromised. No change of possession followed the Deed. It seems, that either at the time of this Deed, or soon after, some division of the other slaves of the father was made among the other children. Things remained in this way, the father still in possession of the property, till 1803; when it was agreed among B. Talbert and his children, that the former division should, be done away, and *a new division take place. For this purpose, the children were called to their father’s house, and all attended but one (Thomas.) Jenny had now six children ; and it was agreed, that the five children should have one each ; and it was distinctly understood, that the former division was to be done away, and the Deeds (as the witness expresses it) to be forgotten and laid aside; and Jenny and her youngest son were to be set free. That the Appellant Charles, assented to this arrangement, is fully proved; for, several witnesses state, that while the division was pending, one of the sons-in-law finding Jenny not included in the scheme, asked “what is to be done with big Jenny?” To which the Appellant answered, “Never mind big Jenny. Our mother” (who was then dead) “wished her to be free, and she shall be free.” Accordingly, B. Talbert, by Deed, emancipated Jenny, the day after the division; and some time after, he, by Deed, emancipated her son Lorenzo. Both these Deeds were recorded. Jenny had two other children afterwards. From the time of her emancipation in 1803, till 1813, Jenny acted in all respects as a free person, and kept her three youngest children with her. B. Tal-bert died in 1809. The Appellant never objected to the Deeds of emancipation; nor, that we hear of, ever made any claim to Jenny or her children, during the life of his father; nor after his death, till the year 1813, when he took possession of the three children, leaving Jenny at large. She sued at Law for the freedom of er children, and a verdict was found foi the Defendant.
Two objections were taken for th Appellant, on the argument. 1. That Equity has no jurisdiction of the cause. 2. That the Judgment at Law is a bar, so far as it relates to the children.
As to the first. Though not fond of extending Equity jurisdiction, I think this is a case which it may fairly reach; at least, concurrently with a Law Court. See Dempsey v. Lawrence, Gilm. 333.
*The more serious question is, can it take cognizance after a trial at Law? And in common cases, I should be clear that it could not, if the trial at Law was fair. But there is something peculiar in this case. I do not mean that this is a claim for freedom. That, we all agree, must stand on precisely the same ground with any question of property. Nor do I mean, that this is the case of a mother, who had herself been a slave, and was suing as next friend for infants who were held in slavery. This circumstance would prepare us to expect, that the cause of tne paupers would not probably be presented to the Jury in its best shape; but that would furnish, of itself, no ground for a new trial of the question. The peculiar feature is this: The arrangement by which the five children of Jenny were divided among the children of Talbert, the former conveyance done away, and Jenny and her last child freed, was a family matter entirely. The children called together, and the business settled without writing, the only persons who could give evidence of this settlement, were the children; and they were strongly interested in keeping fair weather with their brother Charles. For, if the Deed of 1792, under which he succeeded, was good to hold the three youngest children of Jenny, it was equally so to hold the four born between 1792, and 1803, and divided among the brothers and sisters of the Appellant. They might well, therefore, be tempted to withhold their evidence, upon a compact expressed or understood, that if Charles might be per *649 mitted to recover the three youngest children, he would suffer them to retain their portions; and so sensible does the Appellant seem of this, that he told a witness, he had his brothers and sisters feed; for, if they said any thing against him, he would take away their negroes. And in the last examinations we find, that one of the principal witnesses, Mrs. Elizabeth Scott, said, that as Charles had offended her, she would now let out the whole truth ; from which it would seem, that it had not before been let out. These considerations satisfy me, that *the case was not fully before the Jury, nor the evidence such as it now appears; and that this proceeded, not from negligence in the paupers, but from causes beyond their control.
The case of Isaac v. Johnson, S Munf. 95, is much stronger than this. Thére, the pauper sued for his freedom at Common Law, had a verdict against him, and moved for a new trial, which was overruled, and Judgment entered. He was then sold. Afterwards, he petitioned, and had leave to institute another suit in the Corporation of Lynchburg; which was removed to the Superior Court of Law. Pending this suit, being advised by Counsel that the former Judgment might be pleaded in bar against him, he filed a bill in the Superior Court of Chancery in Richmond, setting forth sundry grounds of relief, and praying that the former Judgment might be set aside, &c. The Injunction was granted, and afterwards, on hearing of the bill, answer and exhibits, dismissed, with costs; and a non-suit was suffered in the action at Law, and afterwards another suit in Chancery brought by Isaac in the County Court of Campbell. In this suit a final Decree was pronounced by the County Court in Isaac’s favor; which, on appeal, was reversed by the Court of Chancery, and the bill dismissed; and on appeal to this Court, the Chancellor’s Decree was reversed, and that of the County Court affirmed. This was going vastly beyond what is asked in this case, and further, I confess, that I could have gone. I do not think, then, that under these peculiar circumstances, the Judgment at Law is a bar; and that being removed, there is no difficulty; for, on the merits, the paupers are clearly entitled to their freedom. The first gift, and the Deed, (as the Chancellor says,) were clearly, by the mutual consent of the patties, destroyed by the second division, which might well be done, without Deed ; this being personal property, and possession following the new arrangement. That the Appellant assented to this new division, was proved both by positive '^evidence, and by his long acquiescence in the freedom of Jenny and her children for ten years. The Decree should be affirmed.
JUDGE GREEN.
The Appellant claims under a voluntary Deed, by which his father conveyed to him Jenny and one of her children in 1792. The slaves remained in the possession of the father until 1803, when Jenny had, in all, six children, one of whom was very young; and Basil Talbert had five children, It appears, that when Basil Talbert purchased Jenny, he promised her that whenever she had a child for each of his children, she should be emancipated, and Mrs. Talbert was anxious that this promise should be redeemed. After the death of Mrs. Talbert, it was agreed, that the Appellant and Mrs. Scott, (one of the children of B. Talbert, to whom a conveyance had been made in 1792, of one of Jenny’s children) should give up their claims under those Deeds; and that the five oldest children of Jenny should be assigned, one to each of B. Talbert’s children : and that Jenny should be set free, with her last child, which was accordingly' done; and from this time (1803) until 1809, when B. Talbert died, and until 1813, Jenny lived as a free woman in all respects, and had two other children. In 1813, the Appellant seized the three last children of Jenny as slaves; and they being infants, Jenny sued for their freedom, but not for her own. the Appellant not having seized her. Upon a trial, the Jury found a verdict for the Defendant, and Judgment was accordingly given against the Plaintiffs. This Judgment is relied on as a bar to the Plaintiffs’ claim in this suit, or at least, as to the children of Jenny, and is, I think, the only impediment to their right to freedom.
The transaction, at the last division of the negroes, was, in effect, a restoration of the legal title to Jenny and her children, to B. Talbert. Such a title may pass, without *Deed, when the possession accompanies the transfer of the title, as it did in this case; B. Talbert never having parted with the possession. The Plaintiffs were, therefore, entitled to recover at Law; and in an ordinary case, a Plaintiff so entitled could have no remedy in Equity, after a Judgment against him at Law. But, I do not think this Judgment ought to bar the remedy of these parties in Equity, considering their situation, infants held in slavery; and that the evidence which they now exhibit, was not then in their power; some of the witnesses, as they say, having determined to let out the truth, only since the trial at Law.
All the children of B. Talbert had a motive for not voluntarily communicating the true character of the transaction at the last division; for they apprehended that the Appellant might, as he threatened he would, claim against them the negroes, which they held under that division, by force of the original Deed to him, as he claimed Jenny and her children, if they let out the truth.
I am for affirming the Decree.
The PRESIDENT.
The Deed of gift from Basil Talbert to Charles Talbert, having been regularly recorded, and being of prior date to the two Deeds of emancipation, under which the Appellees claim their freedom, that Deed was an obstacle in the way of their title at Law, which could only be removed, upon the evidence in the record, by a Court of Equity. By that evidence. I think it sufficiently appears, that the Deed of gift was not intended to be effectual between the parties to it; but, to cover the property contained in it, from the consequences of a suit then pending against the donor, and *650 for his benefit only. If this was at all doubtful on the direct evidence to this point in the record, it is rendered manifest by the subsequent conduct of the parties. The full exercise of ownership of the property by the donor, in continuing to hold the possession of it, *and in two instances making a division of it among his children, with the assent of the donee, though ineffectual, prove his entire and exclusive right to it. The Chancellor, I think, was therefore correct in decreeing the Deed of gift to be cancelled, and in liberating the Appellees.
Decree affirmed.*

Jtjdstss Cabell, and Coaltbr, absent.